UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------x
Keith Gibson,                                    :
                                                 :
                    Plaintiff,                   :
                                                 :          **MEMORANDUM & ORDER**
          -against-                              :
                                                 :          06-CV-0179 (DLI)
Commissioner of Social Security,[1]              :
                                                 :
                    Defendant.                   :
------------------------------------------------------x

**DORA L. IRIZARRY, U.S. District Judge:**

  Plaintiff Keith Gibson filed an application for Supplemental Security Income ("SSI")

payments under the Social Security Act (the "Act") on January 17, 2001. The Social Security

Administration ("SSA") denied his application, a decision plaintiff appealed *pro se* during a series

of four hearings before an Administrative Law Judge ("ALJ") between May 13, 2002 and October

8, 2003. By decision dated December 23, 2003, the ALJ concluded that plaintiff was not disabled

within the meaning of the Act. On November 21, 2005, the ALJ's decision became the

Commissioner's final decision when the Appeals Council denied plaintiff's request for review.

Pursuant to Fed. R. Civ. P. 12(c), the Commissioner now moves for judgment on the pleadings,

affirming the determination that plaintiff was not disabled because none of his medical conditions

met the standard for severe impairment. Plaintiff cross-moves for judgment on the pleadings,

seeking reversal of the Commissioner's decision, or alternatively, to remand. For the reasons set

---

[1]Pursuant to Fed. R. Civ. P. 25(d), Michael J. Astrue shall be substituted for Commissioner Jo
Anne B. Barnhart as the defendant in this action.

1

forth below, defendant's motion is denied and plaintiff's motion is granted to the extent that the case is remanded to the Commissioner of Social Security for further proceedings.

## I.    Summary of Facts

*Medical Evidence (Mental)*

Plaintiff's psychiatric history dates to December 8, 1994, when he was hospitalized at Kings County Hospital Center ("KCHC") for two weeks due to depression and auditory hallucinations following the death of his brother. (Admin. R. at 83, 124.)  Although KCHC's records of plaintiff's 1994 hospitalization were not provided in the record, Dr. Aaron Pinkhasov, a psychiatrist at New Hope Guild Center ("NHGC"), referred to this 1994 hospitalization in a 2001 assessment of plaintiff. (Admin. R. at 154.)  Dr. Pinkhasov also wrote that "the patient has a definite psychotic history that has been well controlled with Trilafon[2] for several years." (*Id.*)

Plaintiff began monthly outpatient treatment at NHGC on December 26, 2000. (Admin. R. at 175.)  His physician at NHGC, Dr. Green, diagnosed plaintiff with schizoaffective disorder, again manifested by auditory hallucinations and depression.  Dr. Green treated these symptoms with Trilafon and Remeron[3] as well as therapy. (Admin. R. at 175-76.)

On January 10, 2001, plaintiff presented at the KCHC psychiatric emergency department. He reported having quit his job the day before due to stress, and complained of sleep deprivation, weight loss, paranoia, and feelings of depression since his mother passed away in August of 2000.

---

[2]Commercial name for perphenazine, an drug indicated for management of manifestations of psychotic disorders.  RxList, The Internet Drug Index ("RxList"), *http://www.rxlist.com/cgi/generic/perphenazine.htm.*

[3]Commercial name for mirtazapine, a tetracyclic antidepressant indicated for the treatment of major depressive disorder.  RxList, *http://www.rxlist.com/cgi/generic/mirtaz.htm.*

(Admin. R. at 113.) After conducting an intake interview, Dr. Schoos, a staff psychiatrist, diagnosed plaintiff with adjustment disorder, seasonal affective disorder (by history), and bereavement. (Admin. R. at 115.) Dr. Schoos rated plaintiff's level of consciousness as "alert," his attention "good," his memory "intact," and his concentration "fair." (*Id*.)

The next day, on January 11, 2001, plaintiff was transferred to University Hospital of Brooklyn, State University of New York ("SUNY DMC"), where he attended individual and group therapy for several weeks. (Admin. R. at 121.) Although his condition temporarily worsened when Dr. Pinkhasov tapered the dosage of Trilafon, plaintiff's mood improved upon restoration of the original dosage. At the time of plaintiff's discharge on January 31, 2001, he displayed no symptoms of either depression or psychosis, nor any suicidal ideations. (Admin. R. at 155-56.) Dr. Pinkhasov described him as "cooperative" and "very interactive" in his summation, and wrote that plaintiff displayed motivation in "improving his own health" and was "compliant with his treatment plan." (Admin. R. at 155.) Plaintiff's treatment plan consisted of outpatient sessions at NHGC and continuation on both Remeron and Trilafon. (Admin. R. at 156.)

After plaintiff applied for SSI payments, several doctors evaluated his ability to mentally function in a work environment. Dr. Green prepared the first of these evaluations on February 28, 2001, using a form from the New York State Division of Disability Determinations. (Admin. R. at 175-81). He diagnosed plaintiff with schizoaffective disorder and found plaintiff's overall ability to perform work related mental activities to be "very impaired." (Admin. R. at 175, 179.) Dr. Green described plaintiff's understanding, memory, concentration and persistence as "limited," and stated that plaintiff's "activities of daily living" and "ability to function in a work setting" were "impaired due to mental illness." (Admin. R. at 179.) Dr. Green failed to provide an explanation for his

findings or a long-term prognosis. Dr. Green also failed to mention the potentially mitigating effects of plaintiff's continued treatment.

Dr. Flavia Robotti, a psychiatrist at Kings Medical Services in Manhattan, performed the second evaluation at the behest of the SSA on March 16, 2001. (Admin. R. at 173-74.) Plaintiff told her that "he cannot work because stress makes him become sick and makes him go off medications." (Admin. R. at 173.) Dr. Robotti wrote that plaintiff "does not hear voices when he is taking his medication but sometimes he stops taking [it] for unexplained reasons." (*Id*.) Dr. Robbotti's medical status examination states: "Speech is relevant and coherent, no oddities, no delusions, no hallucinations, no suicidal or homicidal ideation. Insight and judgment seems good." (*Id*.) Dr. Robotti's medical source statement states:

> There is consistency for allegations for a psychiatric diagnosis. Patient's memory and understanding show no limitations. Sustained concentration and persistence no significant limitations. Social interaction and adaptation shows moderate limitations.

(Admin. R. at 174.) Dr. Robotti diagnosed plaintiff with bipolar disorder, and ruled out schizoaffective disorder. (*Id*.) She gave plaintiff a "somewhat guarded" prognosis finding that "[p]laintiff could benefit from a more active psychiatric intervention." (*Id*.) Dr. Robotti recommended that plaintiff continue at NHGC and maintain his current medications. (*Id*.)

Dr. Janice Drucker, a non-examining review psychiatrist with the State Agency, was the third physician to specifically evaluate plaintiff's eligibility for SSI benefits. On an SSA form entitled "Mental Residual Functional Capacity Assessment," dated April 19, 2001, Dr. Drucker recorded that plaintiff was "not significantly limited" in every category because as long as plaintiff complied with his treatment and medications, he was able to "understand, remember, [and] carry out instructions, sustain attention [and] concentration, relate to coworkers [and] supervisors, [and] adapt to changes

in work environment." (Admin. R. at 184.) On an SSA form entitled "Psychiatric Review Technique," also dated April 19, 2001, Dr. Drucker labeled plaintiff's "Restriction of Activities of Daily Living" and "Difficulties in Maintaining Social Functioning" as "slight," and his "Deficiencies in Maintaining Concentration, Persistence, or Pace" as "seldom." Dr. Drucker recorded that plaintiff had "one or two" episodes of deterioration of "extended duration." (Admin. R. at 195A.) However, she specifically suggested denial of plaintiff's benefits in a memorandum to the New York State Division of Disability Determinations, adding: "client stabilized - as long as he takes meds, he's likely to remain stable." (Admin. R. at 199.)

Plaintiff's third hospitalization began on June 23, 2001, and consisted of a two-week inpatient program at SUNY DMC. (Admin. R. at 212.) Plaintiff reported exacerbated depression, disturbed sleep, and suicidal ideation, albeit without an actual attempt. (Admin. R. at 398.) Plaintiff also reported an "overwhelming sense of loneliness," stemming from the death of his mother, and felt "isolated." (Admin. R. at 211.) Although NHGC changed plaintiff's antidepressant prescription from Remeron to Prozac three weeks prior to the hospitalization, it is unclear from the record whether plaintiff had been taking his medication as directed during that period. (*See* Admin. R. at 210.) Dr. Pinkhasov again treated plaintiff during his third hospitalization, and diagnosed him with major depression. (Admin. R. at 265.) He maintained plaintiff on Trilafon and Prozac, and also prescribed Trazadone.[4] Plaintiff was discharged on July 5, 2001 with instructions to continue treatment with Dr. Green at NHGC. (Admin. R. at 224.) Plaintiff was also referred to Downstate Mental Hygiene Associates ("DMHA") for outpatient care. (Admin. R. at 227.) He returned to

---

[4]Generic term for Desyrel, an antidepressant drug unrelated to the tricyclic or serotonin reuptake inhibitor classes of antidepressants. RxList, *http://www.rxlist.com/cgi/generic/traz.htm.*

SUNY DMC for a follow-up visit on September 10, 2001, and Dr. Muniyappa continued his prescriptions for all three medications. (Admin. R. at 206.)

Plaintiff began outpatient treatment at DMHA on July 28, 2001, which continued through June 2002. (Admin. R. at 292.) In a letter dated August 25, 2001, plaintiff's primary psychiatrist, Dr. Ellen Nudelman, stated: "Mr. Gibson suffers from major depression with psychotic features. Based on one initial visit, it appears that he is not able to work at this time. Further determination of ability to work will depend on future visits, however, and cannot be determined now." (Admin. R. at 312.) However, in a letter dated October 27, 2001, Dr. Nudelman stated: "Please be advised that [plaintiff] is able to return to work at this time. He has no limitations whatsoever on his ability to do work. Furthermore we predict that he will do a good job and be successful in his employment." (Admin. R. at 311.) On May 13, 2002, after approximately ten months of outpatient treatment, Dr. Nudelman completed a form entitled "Medical Evaluation: Psychiatric Impairments," in which she reconfirmed plaintiff's diagnosis of major depression with psychotic features, noting that it was recurrent, but "in full remission." (Admin. R. at 313.) Dr. Nudelman then added the following:

> He was hospitalized briefly on each occasion, responding well to psychotropic meds, which relieved all [symptoms] (depressed mood, auditory hallucinations, suicidal ideation). When not having an episode, [plaintiff] is completely symptom-free, and he has remained euthymic, nonpsychotic and stable during his ten-month period of outpatient treatment at our facility. He needs to continue on meds, to prevent recurrence of [symptoms], although dosages will be reduced for "maintenance." He has never been delusional, manic, aggressive, and never made a suicide or self-injurious attempt.

(Admin. R. at 314.) She acknowledged that plaintiff's impairment could be expected to last at least twelve months, but clarified that he "has no actual impairment as long as medication is continued."

(*Id.*)  On an SSA form dated May 18, 2002, Dr. Nudelman rated as "unlimited/very good" plaintiff's ability to follow work rules, relate to co-workers, interact with supervisors, deal with work stresses, function independently, and maintain concentration.  (Admin. R. at 323-27.)  She gave the same rating to plaintiff's ability to understand, remember and carry out complex job instructions, and wrote that he had "no limitations" in his ability to do any work-related mental activities.  (*Id.*)

Plaintiff was hospitalized twice more for mental issues at SUNY DMC, from April 16 to May 10, 2004, and from May 14 to May 17, 2004.  (Admin. R. at 579-80.)  The record does not provide a formal diagnosis.  However, plaintiff received prescriptions for Risperdal,[5] Effexor,[6] and Klonopin[7] upon discharge.  Because the two 2004 hospitalizations occurred approximately five months after the ALJ rendered his decision, plaintiff submitted copies of the treatment records to the Appeals Council on May 18, 2004, during its review of the ALJ's decision.  (Admin. R. at 9.)

*Medical Evidence (Physical)*

Plaintiff's documented treatment history for physical ailments dates to 1976, when he underwent surgery for a hernia.  (Admin. R. at 306.)  From January 27, 1994 through September 8, 1994, plaintiff made a series of five visits to KCHS, complaining of neck, back and shoulder pain, and numbness in his wrist.  (Admin. R. at 136-49.)  He claimed that his pain began in November 1992, stemming from an improperly-administered tetanus shot.  (Admin. R. at 148.)  A CT scan and

---

[5] A psychotropic agent indicated for treatment of schizophrenia.  RxList, *http://www.rxlist.com/cgi/generic/risperid.htm.*

[6] A structurally unique antidepressant indicated for management of Major Depressive Disorder. RxList, *http://www.rxlist.com/cgi/generic/effexor.htm.*

[7] A benzodiazepine indicated for treatment of panic disorder.  RxList, *http://www.rxlist.com/cgi/generic/clonaz.htm.*

x-ray revealed a moderately herniated lumbar disc and degenerative joint disease, respectively. (Admin. R. at 147.) Plaintiff's physicians could not confirm possible bilateral mild carpal tunnel syndrome because plaintiff refused to allow an EMG study of his neck and upper extremities. (Admin. R. at 145.) KCHS prescribed plaintiff Tylenol for the pain. (Admin. R. at 148.)

Plaintiff was diagnosed with diabetes in October 1997 at the KCHC Diabetic Clinic. (Admin. R. at 135.) KCHC treated him with insulin until 1998, after which plaintiff controlled his diabetes through diet and exercise alone. (Admin. R. at 125.)

On June 18, 2002, plaintiff presented to SUNY DMC complaining of lower back pain, and received Motrin and Tylenol. A physician described plaintiff's hypertension, of which there is no earlier record, as "well-controlled" after a routine examination during that visit. (Admin. R. at 559-60.) During a follow-up visit on April 17, 2003, plaintiff was advised to receive an MRI but declined, citing both a lack of funds and claustrophobia. (Admin. R. at 574.)

On July 8, 2003 plaintiff again presented to SUNY DMC, complaining of pain in his legs, back and neck during the preceding two days. (Admin. R. at 564.) He requested and received a cane to assist in walking. Dr. Michael Lucchesi opined that plaintiff suffered from degenerative joint disease, a diagnosis he confirmed on August 22, 2003 during a follow-up visit. Plaintiff received an assessment of "controlled" for both his diabetes and hypertension during a routine examination on this date. (Admin. R. at 572-73.)

*Plaintiff's SSI Application and Testimony*

Plaintiff is currently fifty-two years old and has never been married, although he has a girlfriend. (Admin. R. at 102.) He came to the United States from Trinidad in 1972, and was a resident alien awaiting full citizenship at the time of the hearings. (Admin. R. at 16.) Plaintiff

speaks, reads and writes English. His education consists of a high school diploma and two years of college.

Plaintiff's SSI application (prepared with the help of his girlfriend) states that he has no issues with memory, attention, completing tasks, following instructions, or getting along with others. (Admin. R. at 108.) He is able to pay bills, count change, handle a bank account, and use a checkbook. (Admin. R. at 102, 105-06.) Plaintiff prepares meals, cleans, irons, uses public transportation, and shops, all without assistance, and enjoys playing sports in the summer. (Admin. R. at 105.) He also engages in such leisure activities as reading, listening to music, and watching television. (Admin. R. at 106.) Plaintiff testified that he occasionally socializes with others, goes to church daily, and spends time at his girlfriend's house. (Admin. R. at 660-61.) He also testified that he spends winters in the Caribbean due to his back pain. (Admin R. at 621.)

Plaintiff's past work experience, beginning in 1979 and lasting intermittently until 2001, includes both full- and part-time jobs, as a bank manager, hospital clerk and maintenance person. (Admin. R. at 99.) Most recently, plaintiff worked for a temporary employment agency, performing such tasks as data entry, mail sorting, medical billing, and office cleaning. (Admin. R. at 643-44.) However, plaintiff quit just prior to his second hospitalization in January 2001, claiming that it "was too stressful." (Admin. R. at 117.) Upon discharge from SUNY DMC, plaintiff learned that his position at the temporary employment agency was no longer available. (Admin. R. at 645.) Plaintiff subsequently received New York State unemployment benefits for thirty-nine weeks, through April 2002. (Admin. R. at 622.) During this period, plaintiff certified weekly that he was "ready, willing, and able" to resume work, as required by New York labor law. (Admin. R. at 624.)

Plaintiff testified that he could no longer work due to his high blood pressure, diabetes, back pain from a herniated disk, depression, stress, and paranoia. (Admin. R. at 650.) He further testified that he was unable to sit or stand for extended periods, or lift anything as heavy as two gallons of milk. (Admin. R. at 663.) The combination of Motrin and Tylenol alleviated the pain somewhat, enough for him to continue his day if he moves slowly. (Admin. R. at 652-53.) He received no other treatment for his back, having declined surgery and acupuncture for fear of permanent paralysis. (Admin. R. at 611, 625.) Plaintiff testified that his diabetes was controlled through a combination of diet and his daily exercise regimen of walking two miles around a track. (Admin. R. at 653, 665.) He also controlled his blood pressure through diet, exercise, and medication. (Admin. R. at 656.) Regarding his mental health, plaintiff testified that he attended therapy, and was taking Prozac and Trazadone. (Admin. R. at 655-56.)

Plaintiff explained at his initial hearings that he was unrepresented because an attorney had declined to take his case. (Admin. R. at 635.) He eventually decided to testify *pro se*. (*See* Admin. R. at 670, 675.) In November 2003, approximately one month after the final hearing, plaintiff appeared at the Office of Hearings and Appeals to inquire as to the ALJ's decision. At that time, the Office gave him assessment forms for the purpose of updating his doctors' opinions regarding his physical and mental conditions. Plaintiff never returned these forms, and the ALJ therefore made his decision without them. (Admin. R. at 17.)

### The ALJ's Decision

On December 23, 2003 the ALJ issued a written decision, finding that plaintiff was ineligible for SSI payments because he was not disabled within the meaning of the Social Security Act. (Admin. R. at 15.) The ALJ utilized the five-step sequential analysis set forth in 20 C.F.R. §

404.1520 to reach this conclusion. He resolved step one in plaintiff's favor because plaintiff was not engaged in substantial gainful activity during the relevant period. (Admin. R. at 16.) The ALJ resolved step two against plaintiff, however, finding that none of his medical conditions (diabetes, hypertension, back pain, and schizoaffective disorder) constituted severe impairments:

> The problem in this case is that the treating record does not reflect any medical condition, physical or mental, which has prevented work for twelve continuous months or even posed a work-related limitation for twelve continuous months. From time to time, the claimant gets flare ups of mental or physical conditions, but none lasting anything approaching a year - either singly or in combination. To the contrary, the opinion of every doctor who has examined him or reviewed his medical record is that of a person who should be able to return to work without any significant limitations.

(Admin. R. at 17.) Accordingly, the ALJ terminated the sequential analysis at step two. (Admin. R. at 18.)

## II. Discussion

### A. Standard of Review

In reviewing the final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision. *See Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). The former determination requires the court to ask whether "the claimant has had a full hearing under the [Commissioner's] regulations and in accordance with the beneficent purposes of the Act." *Echevarria v. Sec'y of Health and Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982) (citation and internal quotation marks omitted). The latter determination requires the court to ask whether the decision is supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

The district court is empowered "to enter, upon the pleadings and transcript or the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the case for a rehearing." 42 U.S.C. § 405(g). Remand is appropriate where "the Commissioner has failed to provide a full and fair hearing, to make explicit findings, or to have correctly applied the application and regulations." *Manago v. Barnhart*, 321 F. Supp. 2d 559, 568 (E.D.N.Y. 2004) (collecting Second Circuit cases). Remand is also appropriate "where there are gaps in the administrative record." *Rosa v. Callahan*, 168 F.3d 72, 83 (2d Cir. 1999) (quoting *Sobolewski v. Apfel*, 985 F. Supp. 300, 314 (E.D.N.Y. 1997)).

**B.     Standards Governing Evaluation of Disability Claims By ALJ**

An individual is "disabled" under the Act if he or she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). The Act further provides that an individual is "disabled":

> only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 1382c(a)(3)(B). The claimant bears the initial burden of proof of showing disability. *See Carroll v. Sec'y of Health and Human Servs.,* 705 F.2d 638, 642 (2d Cir. 1983).

Pursuant to 20 C.F.R. § 416.920, there is a five-step process by which the ALJ determines disability under the Act. If at any step the ALJ finds that the claimant is either disabled or not, the inquiry ends. At the first step, the claimant is not disabled if he or she is working and performing

"substantial gainful activity."  20 C.F.R. § 416.920(b).  Second, the ALJ considers whether the claimant has a "severe impairment," without reference to age, education, or work experience. Impairments are "severe" when they significantly limit a claimant's physical or mental "ability to conduct basic work activities."  20 C.F.R. § 416.920(c).  "Basic work activities" are further defined as the "abilities and aptitudes necessary to do most jobs."  20 C.F.R. § 416.921(b).  Physical examples include walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, and handling.  *Id*.  Mental examples include "understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting."  *Id*.  Even if no single impairment is judged severe enough to significantly limit the claimant's ability to conduct such activities, the combined effects of all impairments must be considered in step two of a disability evaluation.  20 C.F.R. § 416.923.

At the third step, the ALJ will find the claimant disabled if his or her impairment meets or equals an impairment listed in Appendix 1.[8]  20 C.F.R. § 416.920(d).  If the claimant does not have a listed impairment, the ALJ makes a finding about the claimant's "residual functional capacity" in steps four and five.  20 C.F.R. § 416.920(e).  In the fourth step, the claimant is not disabled if he or she is able to perform "past relevant work."  20 C.F.R. § 416.920(f).  Finally, in the fifth step, the ALJ determines whether the claimant could adjust to other work existing in the national economy, considering factors such as age, education, and work experience; if so, the claimant is not disabled. 20 C.F.R. § 416.920(g).  The burden of showing that the claimant could perform other work in this

---

[8]20 C.F.R. pt. 404, subpt. P, app. 1.

final step shifts to the Commissioner. *See Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir. 2002)

(citing *Carroll*, 705 F.2d at 642).

### C.    The ALJ Properly Found Plaintiff's Medical Impairments To Be Not Severe

Plaintiff contends that substantial evidence does not support the ALJ's dismissal at step two

because his mental and physical impairments limited his ability to conduct "basic work activities."

20 C.F.R. § 416.920(c).  Specifically, plaintiff argues that:

> a psychiatric impairment – i.e., Major Depression with psychotic features – which is
> responsible for two, three-week inpatient hospitalizations in 2001; and, an additional, three-
> week hospitalization in April of 2004; and significant outpatient therapy in between
> hospitalizations; which requires active management with both antipsychotic and
> antidepressant medications; and, which despite medical management, continues to result in
> hospitalizations, must be said at least to interfere with one's ability to perform basic work
> activities.  The frequency and length of his hospitalizations, coupled with the fact that they
> apparently continue to be necessary, documents that medication is not fully controlling his
> condition and that he is unable to sustain a full-time job.

(Pl.'s Mem. Supp. J. Plead. 16.)  Plaintiff's statement, however, confuses the statutory meaning of

"ability to perform basic work activities" with the ability to work in general.  *See* 20 C.F.R. §

416.920(c).  Clearly, any hospitalization temporarily interferes with the latter.  The regulations,

however, refer to the former as "abilities and aptitudes necessary to do most jobs."  20 C.F.R. §

416.921(b).  Focusing on plaintiff's inability to work during the infrequent "flare-ups" of his

symptoms ignores the crucial question of whether he retained such abilities and aptitudes at other

times, especially when given proper treatment.  *See Wilson v. Apfel*, 179 F.3d 1276, 1279 (11th Cir.

1999) (affirming ALJ's finding that a patient requiring occasional hospitalization did not have a

severe impairment, where substantial medical evidence indicated that patient manifested few

symptoms of the disease).  Given plaintiff's failure to prove that his physical or mental impairments,

14

either singly or in combination, significantly limited his ability to perform basic work activities, the ALJ's decision to terminate the sequential analysis at step two is supported by substantial evidence.

1.     Physical Impairments

At the outset, the court notes that plaintiff did not claim in his initial SSI application to be "disabled" because of any physical impairments. (*See* Admin. R. at 17.)  Indeed, the first mention of plaintiff's alleged physical impairments was at the hearings before the ALJ, where plaintiff stated that he could not work in part because of hypertension, diabetes and back pain resulting from a herniated disk.  (Admin. R. at 17, 650.)  Nonetheless, the record reveals that plaintiff's physical impairments were not "severe" within the meaning of the Act.  20 C.F.R. § 416.920(c).

The only reference to plaintiff's hypertension in the record is in a report prepared by a physician at SUNY DMC after a routine examination on June 18, 2002.  The report states that plaintiff's hypertension was "well-controlled."  (Admin. R. at 560.)  Moreover, plaintiff's blood pressure readings were generally in the normal range, and there were no reports of any end organ damage or cardiac or vascular abnormalities.  Similarly, plaintiff was diagnosed with diabetes in October 1997 at KCHC Diabetic Clinic, but after being treated with insulin until 1998, plaintiff has been able to control his diabetes through diet and exercise alone.  (Admin. R. at 125, 155, 206, 560, 573, 653-54, 663, 665.)  Plaintiff wears glasses to correct his nearsightedness; however, there is no evidence of any diabetic retinopathy or other end organ damage.

Although plaintiff's history of back pain dates to 1994, the record contains little evidence of any recent back problem which would significantly limit plaintiff's ability to do basic work activities. From January 24, 1994 through September 8, 1994, plaintiff made a series of five visits to KCHS, complaining of neck, back and shoulder pain, in addition to numbness of his wrist.

(Admin. R. at 136-49.)  A CT scan and x-ray revealed a moderately herniated lumbar disk and degenerative joint disease, respectively; however, plaintiff's physicians could not confirm possible bilateral mild carpal tunnel syndrome because plaintiff refused to allow an EMG study of his neck and upper extremities.  (Admin. R. at 145, 147.)  KCHS prescribed plaintiff Tylenol for the pain, and plaintiff resumed work.  (Admin. R. at 148.)

Plaintiff waited eight years before seeking additional treatment for his back; significantly, he presented to SUNY DMC four times complaining of lower back pain *after* the issue was raised at the May 13, 2002 hearing before the ALJ.  (Admin. R. at 559-60, 564, 572-74.)  Plaintiff's physical examination on June 18, 2002 demonstrated that he retained good motor strength, and SUNY DMC provided plaintiff with Motrin and Tylenol for the pain.  (Admin. R. at 560.)  Plaintiff did not seek treatment again until April 17, 2003, notably ten months later, at which time plaintiff's physical examination was unremarkable.  (*See* Admin. R. at 576.)  Plaintiff again presented to SUNY DMC on July 8, 2003, complaining of pain in his legs, back and neck during the preceding two days. Although Dr. Lucchesi noted that plaintiff "came in walking" and had only been treated with Motrin, he provided plaintiff with a cane, upon plaintiff's request.  (Admin. R. at 566.)  Dr. Lucchesi opined that plaintiff suffered from degenerative joint disease, a diagnosis confirmed on August 22, 2003 during a follow-up visit.  (Admin. R. at 566, 572-73.)

Subjective pain may serve as the basis for establishing disability; however, an ALJ may evaluate the credibility of an individual's allegations of pain.  *See Marcus v. Califano,* 615 F.2d 23, 27 (2d Cir. 1979).  Here, the ALJ properly attributed significance to plaintiff's failure to seek any medical attention for his back pain during the relevant period in finding plaintiff's allegations of back pain to lack credibility.  *See Arnone v. Bowen*, 882 F.2d 34, 39 (2d Cir. 1989).  Significance

may also be attributed to the fact that plaintiff only received minimal, intermittent medical treatment, and that he only has been prescribed over-the-counter medication for his back pain. *See Williams v. Bowen,* 790 F.2d 713, 715 (8th Cir. 1986) ("A claimant's allegations of disabling pain may be discredited by evidence that he or she received minimal medical treatment and/or has taken medications, other than aspirin, for pain only on an occasional basis."); *Jones v. Heckler,* 702 F.2d 616, 622 (5th Cir. 1983) (upholding ALJ's determination that the claimant was not disabled in part because she was "not taking an inordinate amount of prescribed pain medications."). Finally, the record reveals that plaintiff prepares meals, cleans, irons, uses public transportation, shops, plays sports, and walks two miles a day, all without assistance. (Admin. R. at 105, 653-54, 663.) Plaintiff also testified that he was able to work in 2001 and 2002 because his back had "eased up." (Admin. R. at 623-24, 641.) As such, substantial evidence supports the ALJ's determination that plaintiff's physical impairments were not "severe" within the meaning of the Act. 20 C.F.R. § 416.920(c).

2. <u>Mental Impairments</u>

As the ALJ acknowledged, the "most significant aspect of Mr. Gibson's medical history is psychiatric." (Admin. R. at 16.) However, the record indicates that plaintiff's symptoms are controlled, so long as he is compliant with physicians' instructions regarding outpatient treatment and medication, and that when he does suffer acute symptoms, they last no longer than a few weeks. Substantial evidence therefore supports the ALJ's determination that plaintiff's mental impairment was not "severe" because plaintiff failed to prove that his psychiatric condition adversely affects his ability to perform basic work activities for a continuous period of not less than twelve months when he is properly treated.

The first record of plaintiff's psychiatric condition is a two-week hospitalization at KCHC in 1994 precipitated by the death of his brother. In a 2001 assessment of plaintiff, Dr. Pinkhasov referred to this 1994 hospitalization, noting that plaintiff's "psychotic history . . . has been well controlled with Trilafon for several years." (Admin. R. at 154.) Plaintiff's second hospitalization took place in January 2001 at SUNY DMC, where plaintiff attended individual and group therapy sessions for approximately three weeks. After being "compliant with his treatment plan," plaintiff was discharged on January 31, 2001 because he no longer displayed any symptoms of either depression or psychosis, nor had any suicidal ideations. (Admin. R. at 155-56.) Three months later, Dr. Drucker specifically wrote that plaintiff could perform basic mental work functions as long as he is compliant with treatment and medications. (Admin. R. at 184, 186, 199.)

On June 23, 2001, plaintiff was admitted at SUNY DMC for a two-week inpatient program, complaining of suicidal ideation, exacerbated depression, disturbed sleep, and an "overwhelming sense of loneliness" stemming from the death of his mother. (Admin. R. at 211-12, 398.) Dr. Pinkhasov maintained plaintiff on Trilafon and Prozac and prescribed Trazadone, and plaintiff was discharged approximately three weeks later with instructions to continue treatment at NHGC. (Admin. R. at 224.) After approximately ten months of outpatient treatment, Dr. Nudelman reported that plaintiff's depression with psychotic features was recurrent, but "in full remission," and that plaintiff responded well to psychotropic medications, which "relieved all [of his symptoms]." Indeed, on an SSA form dated May 18, 2002, Dr. Nudelman rated as "unlimited/very good" plaintiff's ability to follow work rules, relate to co-workers, interact with supervisors, deal with work stresses, function independently, and maintain concentration." She also rated plaintiff's ability to understand, remember and carry out complex job instructions as "unlimited/very good," and wrote

that he had "no limitations" in his ability to do any work-related mental activities. (Admin. R. at 323-27.) The ALJ gave controlling weight to Dr. Drucker's and Nudelman's evaluations, and had "broad authority" to do so under the Act, because Dr. Nudelman treated plaintiff for the longest continuous period (ten months) and Dr. Drucker was an expert in evaluating disability claims. *See Schweiker v. Gray Panthers*, 453 U.S. 34, 43 (1981).

Two reports in the record indicate that plaintiff is significantly limited in his mental ability to perform basic work activities. First, on February 28, 2001, Dr. Green reported plaintiff's overall ability to perform work related mental activities to be "very impaired," finding plaintiff's understanding, memory, concentration, and persistence to be "limited," and his insight and judgment to be "moderately impaired." (Admin. R. at 175-81.) However, Dr. Green failed to provide any explanation for his assessments and did not address the potentially mitigating effects of treatment on plaintiff's symptoms. (*See* Admin. R. at 179.) Second, Dr. Nudelman reported on August 25, 2001 that, "[b]ased on one initial visit, it appears that [plaintiff] is not able to work at this time." (Admin. R. at 312.) However, Dr. Nudelman changed her assessment two months later in a report dated October 27, 2001, which states: "Please be advised that [plaintiff] is able to return to work at this time. He has no limitations whatsoever on his ability to do work. Furthermore we predict that he will do a good job and be successful in his employment." (Admin. R. at 311.) Therefore, Dr. Green's February 2001 and Dr. Nudelman's August 2001 assessments carry little weight when considering *all* of the evidence in the record regarding plaintiff's psychiatric condition.

3.    Combination of Plaintiff's Physical and Mental Impairments

Plaintiff argues that the ALJ failed to consider the combined severity of his psychiatric and physical conditions. However, plaintiff's argument is refuted by the ALJ's decision which states:

"From time to time, the claimant gets flare ups of mental or physical conditions, but none lasting anything approaching a year - *either singly or in combination*." (Admin. R. at 17) (emphasis added.) Plaintiff's argument is therefore rejected.

### D.     The ALJ Failed to Develop the Record

If the administrative record is incomplete, the essentially non-adversarial nature of a benefits proceeding requires the ALJ to affirmatively develop the record. *See Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996). Under the regulations, the ALJ must develop plaintiff's "complete medical history" and "make every reasonable effort" to help plaintiff obtain any required medical reports. 20 C.F.R. § 416.912(d). Generally, the ALJ satisfies this duty if he or she makes (1) an initial request for evidence from a medical source, and (2) if the evidence has not been received within ten to twenty calendar days after the initial request, makes one follow-up request to obtain the medical evidence. *See* 20 C.F.R. § 416.912(e). The regulations also state that, "[w]hen the evidence we receive from your treating physician . . . or other medical source is inadequate for us to determine whether you are disabled, . . . [w]e will first recontact your treating physician . . . or other medical source to determine whether the additional information we need is readily available." 20 C.F.R. § 416.912(e).

The duty of an ALJ to affirmatively develop the record is heightened when a claimant appears *pro se*, as was the case here. *See Cullinane v. Sec'y of Health and Human Servs.*, 728 F.2d 137, 139 (2d Cir. 1984) (remanding for new hearing appropriate where ALJ failed to assist *pro se* litigant in securing all relevant medical testimony). "The ALJ must take all reasonable efforts to obtain past and current medical evidence and assessments from treating sources identified by a *pro se* plaintiff in order to complete the administrative record." *Jones v. Apfel*, 66 F. Supp. 2d 518, 524

(S.D.N.Y. 1999) (citing *Almonte v. Apfel*, No. 96 Civ. 1119, 1998 WL 150996, at *7 (S.D.N.Y. Mar. 31, 1998)).  Reasonable efforts include issuing and enforcing of subpoenas to ensure the production of claimant's medical records, obtaining the testimony of necessary witnesses, and advising the plaintiff of the importance of the evidence.  *See Jones*, 66 F. Supp. 2d at 524 (citing 40 U.S.C. § 405(d)).  When the ALJ fails to undertake such efforts, he or she fails in this duty and "the claimant is deprived of a fair hearing."  *Lopez v. Sec'y of Health and Human Servs.*, 728 F.2d 148, 150 (2d Cir. 1984) (citations and internal quotation marks omitted).

Plaintiff argues that his case must be remanded for further administrative proceedings because the ALJ failed to (1) request a more detailed statement from plaintiff's treating physicians at KCHS and SUNY DMC, or order a consultative examination of plaintiff's back condition, (2) recontact plaintiff's treating doctors after plaintiff failed to return his updated assessment forms, and (3) seek medical records from plaintiff's 2004 hospitalizations.  The court agrees.

The court commends the ALJ's efforts to advise plaintiff of the importance of retaining an attorney and obtaining further evidence.  The ALJ allowed for three continuations of the hearings for that purpose, and issued numerous subpoenas to plaintiff's various treatment centers in an effort to further develop the record.  (Admin. R. at 287, 355.)  The ALJ even went so far as to personally visit SUNY DMC in an attempt to find documentation of plaintiff's back condition.  (*See* Admin. R. at 588.)  The court's holding that the record was inadequately developed is therefore not a rebuke of the ALJ's actions.

Nevertheless, significant gaps in the record remain.  With respect to plaintiff's psychiatric condition, the hearings were devoid of testimony from plaintiff's numerous psychiatrists and therapists.  Particularly useful would have been Dr. Green's testimony because he was the only

psychiatrist to find plaintiff's overall ability to perform work related mental activities to be "very impaired." It is also significant that the ALJ denied plaintiff's SSI application five months before plaintiff's two hospitalizations in 2004 at SUNY DMC for mental issues. Although plaintiff submitted copies of his treatment records to the Appeals Council on May 18, 2004, the records do not set forth why plaintiff was admitted, what treatment he underwent during the two hospitalizations, or what his formal diagnosis was upon discharge. The records do, however, state that plaintiff received prescriptions for three new medications, namely Risperdol, Effexor and Klonopin. Considering that the ALJ denied plaintiff's SSI application in part because Dr. Drucker and Dr. Nudelman both found that plaintiff could perform basic mental work functions *so long as* he was compliant with treatment and medications, the fact that SUNY DMC changed his medications might indicate that the medications plaintiff was taking during the relevant period were not fully controlling his condition. Finally, the ALJ's failure to request more detailed statements from plaintiff's treating physicians at KCHS and SUNY DMC, or to order a consultative examination of plaintiff's back condition, was error because the record does not contain a written assessment of plaintiff's back injury on his ability to work.

**III.    Conclusion**

The Social Security Act is a remedial statute which must be "liberally applied;" its intent is inclusion rather than exclusion. *Cutler v. Weinberger*, 516 F.2d 1282, 1285 (2d Cir. 1975). Consistent with that view, "courts have not hesitated to remand for the taking of additional evidence, on good cause shown, where relevant, probative and available evidence was either not before the Secretary or was not explicitly weighed and considered by him, although such consideration was necessary to a just determination of a claimant's application." *Id*. Plaintiff, appearing *pro se* in the

administrative proceedings with a documented psychiatric condition, did not have a full and adequate hearing under the Commissioner's regulations. Since counsel now represents plaintiff, it is likely that the unexplored information discussed above will be pursued.

Accordingly, this case is remanded to the Commissioner for further evidentiary proceedings. To prevent further delay in the processing of plaintiff's case, further proceedings must be completed within sixty days of this order, i.e. by September 20, 2007; if plaintiff's benefits remain denied, the Commissioner is directed to render a final decision within sixty days of plaintiff's appeal, if any. *See Butts v. Barnhart*, 388 F.3d 377, 388 (2d Cir. 2004) (suggesting procedural time limits to ensure speedy disposition of Social Security cases upon remand by District Courts). Upon remand, the Commissioner should obtain further information from plaintiff's treating physicians at KCHS and SUNY DMC, plaintiff's treating psychiatrists, including particularly Dr. Green, and about plaintiff's two 2004 hospitalizations at SUNY DMC. Furthermore, given plaintiff's testimony that he spends winters in the Caribbean, the ALJ on remand should inquire as to whether plaintiff was out of the country for the entirety of any month during the relevant period because, under the regulations, claimants may not receive benefits for any month throughout which they are outside the country. *See* 20 C.F.R. § 416.1327.

SO ORDERED.

DATED:      Brooklyn, New York
            July 20, 2007

            _____/s/_____
                    DORA L. IRIZARRY
                  United States District Judge